[Cite as *Wright State Univ. v. Am. Assn. of Univ. Professors, Wright State Chapter*, 2023-Ohio-1238.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| WRIGHT STATE UNIVERSITY | : | |
| | : | |
| Appellant | : | C.A. No. 2022-CA-54 |
| | : | |
| v. | : | Trial Court Case No. 2022 CV 0214 |
| | : | |
| WRIGHT STATE UNIVERSITY | : | (Civil Appeal from Common Pleas |
| CHAPTER OF THE AMERICAN | : | Court) |
| ASSOCIATION OF UNIVERSITY | : | |
| PROFESSORS | : | |
| | : | |
| Appellee | | |

. . . . . . . . . . .

O P I N I O N

Rendered on April 14, 2023

. . . . . . . . . . .

GEORGE S. CRISCI and SCOTT H. DEHART, Attorneys for Appellant

BROOKS W. BORON, Attorney for Appellee

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Wright State University ("WSU") appeals from a judgment of the Greene County Court of Common Pleas, which denied its motion to vacate an arbitration award and granted the motion of the American Association of University Professors, Wright

State University Chapter ("the Chapter") to confirm and enforce the arbitration award. At issue was the grievance of Dr. Marlese Durr, a tenured professor at WSU, who had taught classes in the Sociology and Anthropology Department full-time since 1994. For reasons discussed below, WSU had imposed disciplinary actions on Durr in July 2020. Because we conclude that the arbitrator lacked jurisdiction over the matter pursuant to the parties' collective bargaining agreement (CBA), the judgment of the trial court is reversed, and the arbitration award is vacated.

{¶ 2} In late fall 2019, WSU received numerous complaints about Durr. Multiple students reported through an online portal that Durr had been rude in class and had threatened to withhold student grades. An anonymous academic advisor also reported that four or five students had indicated that they "experienced discomfort and uncertainty" in Durr's class. Faculty Affairs Program Manager and Ombudsperson Shannon Norton complained that a student had reported that Durr was late for an exam; Norton also reported that Durr had been rude to her and to others. Executive Assistant to the Provost Becky Traxler complained that Durr had been rude to her on the phone.

{¶ 3} These complaints found their way to Dr. Cheryl Meyer, then Vice Provost for Faculty Affairs. Meyer prepared a "Notice of Complaint and Investigation," which described the complaints, placed Durr on administrative leave, and requested a disciplinary hearing in accordance with the CBA (Joint Exhibit 2); Meyer sent this notice to Durr on January 2, 2020.

{¶ 4} Durr had applied and been approved for family medical leave for the spring semester of 2020; she had informed the human resources department that she would be

using her paid accrued sick leave while on FMLA leave. However, in early July 2020, Meyer sent Durr a second notice of complaint and investigation, which also requested a meeting. The second notice alleged that Durr had failed to report her paid sick leave usage during her FMLA leave, citing Article 28.6 of the CBA (Joint Exhibit 3).

{¶ 5} On July 21, 2020, Durr's disciplinary meeting pursuant to Article 14 of the CBA was held on both complaints. On July 31, 2020, Douglas Leaman, Interim Provost, issued a "Written Statement of Outcome" (Joint Exhibit 4), which stated in part:

> In summary, I find that, through your comments and actions, you have provided an environment that makes students feel unsafe and fearful of retaliation, in violation of University Policy.
>
> I also find that your repeated failure to report paid sick leave usage, despite numerous directives to do so, also violated University Policy and the CBA.
>
> As discipline for these violations, per Article 14 and section 14.5.4 in particular:
>
> ● This letter shall serve as a letter of reprimand/warning and will be placed in your personnel file.
>
> ● You must participate in and complete a series of civility/anger management training courses * * * in the next 30 days.
>
> ● You are denied the opportunity for summer teaching; however, because you did not teach this current summer (2020) due to being on administrative leave status pending resolution of this Article 14 proceeding, we will apply

this discipline retroactively to Summer 2020.

● You are suspended without pay for three days, which will be debited from your August paycheck on a pro rata basis.

● Given your demonstrated lack of understanding of the power differential, for a period of one year you will not be permitted to hold _**any**_ leadership positions at Wright State University. These include any current leadership positions in the Organization for Black Faculty and Staff or as coordinator of the African-American Studies Program.

● As noted above, any future actions which violate University policies will not be tolerated and will almost certainly result in commencement of Article 15 proceedings.

**{¶ 6}** In response to this discipline, on September 8, 2020, Durr filed a "Step One" grievance in accordance with the provisions of the CBA. She identified Leaman as the WSU administrator whose actions she grieved. With respect to the nature of her grievance, Durr cited Sections 3.2 and 3.3 of Article 3 of the CBA. Section 3.2 states, in pertinent part, that the University shall not discriminate on the basis of race. Similarly, Section 3.3 states that the University will not tolerate any form of harassment based on race (among other categories). Durr alleged that her discipline was discriminatory based on her race. Durr's proposed resolution of the grievance was that she accept a letter of reprimand in her file and complete the civility/anger management training (which she had already done) but that she be paid for teaching in the summer of 2020, that her suspension be revoked and her three-days without pay be restored, and that the

restriction on her holding leadership positions be removed.

{¶ 7} On October 8, 2020, after a hearing, Barry Milligan, the Interim Dean of the Graduate School, denied Durr's grievance, finding no evidence that the disciplinary process or its results were disproportionate to other cases or that the alleged "inequities" were based upon Durr's race. Milligan also found no evidence of harassment.

{¶ 8} On October 28, 2020, Durr filed a "Step Two" grievance, again asserting that WSU had discriminated against her based upon her race; she named Leaman and Milligan as the administrators whose actions she grieved. After a hearing, Travis Doom, Associate Dean of the College of Engineering and Computer Science, determined that no "substantial evidence" had been provided at the Step-Two grievance hearing that had not already been considered during Step One and that the preponderance of the evidence did not support a finding of discrimination or harassment based on race in violation of Article 3.2 or Article 3.3 of the CBA. *See* Joint Exhibit 8.

{¶ 9} Doom's conclusions noted that Durr's Chapter representative had argued that "nuances" between past practices and Durr's case, such as placing her on paid leave prior to the initial disciplinary meeting, were "punitive and excessive." Durr's representative also asserted that Durr had been denied due process at the initial disciplinary hearing because she had not been given access to "a written file of student complaints."

{¶ 10} In response to the due process arguments, Doom found:

Due process in a university setting allows the faculty an opportunity to respond to potential concerns in a formal or informal meeting. Due to

the nature of the power differential, it is not unusual for students' concerns to be anonymous and/or verbal. Students often fear retribution, particularly when (due to the nature of their chosen area of study) they may have little choice but to interact with a faculty member again in the future. Faculty have a right to hear concerns and respond to them, but not necessarily to know the source, not to have access to details that might identify the source. The result of the process depends on the credibility of the source and the response. Perhaps the individual and anonymous concerns should be considered more skeptically by administration than in-person verbal or on-the-record concerns from multiple credible witnesses, but, in any event, the university process does not (and should not) guarantee that the faculty member face students as accusers, only that they are able to face and respond to accusations/concerns. These opportunities take place during informal meetings * * * as well as more formal disciplinary meetings. [There] is not a preponderance of the evidence that reasonably suggests a failure in due process, let alone due to a protected characteristic of the grievant.

Doom also concluded that the application of different sanctions in different circumstances was warranted by "differing details" of situations and that there was not a preponderance of the evidence to suggest that "a protected characteristic of the grievant" played any role in such differences.

{¶ 11} On December 17, 2020, Durr filed an amended grievance (Joint Exhibit 9),

again naming Leaman and Milligan. She again claimed a lack of due process, excessive punishment, and discrimination and harassment based on race. On January 11, 2021, La Fleur Small, Interim Vice Provost for Faculty Affairs, responded to the amended grievance (Joint Exhibit 10), noting that Durr had "added new arguments and/or repeated old ones" in support of her grievance, but she had not "change[d] or add[ed]" specific provisions of the CBA that she claimed had been violated. Small therefore concluded that Durr's amended grievance was not a proper usage of Article 16.9 of the CBA, which sets forth specific bases for the filing of an amended grievance; Small denied the amended grievance and affirmed the prior decisions. Additionally, Small concluded that, even if the "additions" to Durr's argument were considered, the result would be the same, finding "ample 'due process' " and no basis for overturning the prior decisions.

{¶ 12} On February 4, 2021, the Chapter filed a request for arbitration with the Federal Mediation and Conciliation Service ("FMCS"). WSU objected to the demand, asserting that the Chapter had not complied with the terms of the CBA because: 1) the Chapter had failed to provide WSU with adequate notice of its election of arbitration, and 2) the Chapter had missed the 30-day deadline for electing arbitration. WSU agreed to submit the narrow jurisdictional issue to the arbitrator before a hearing on the merits.

{¶ 13} On April 18, 2021, the arbitrator issued a preliminary decision finding that the grievance was arbitrable. Specifically, the arbitrator found that the Chapter's request for arbitration had not been untimely, because WSU's response to Durr's amended grievance constituted a "*new* Step Two answer" from which the 30-day period to request arbitration ran. The arbitrator also found that the CBA did not explicitly require the

Chapter to inform WSU of its election before requesting a panel of arbitrators. The arbitrator stated that he was "uncomfortable implying a notice requirement" when the language of the CBA did not specifically provide for one, "especially in a CBA like this which explicitly and in significant detail imposes notice requirements in other contexts." The arbitrator also noted that, in his experience, it was common practice for a union to elect arbitration by requesting a panel of arbitrators from FMCS or another association of arbitrators without first notifying the employer of its election, unless there was an explicit requirement of prior notice.

{¶ 14} On January 21, 2022, the arbitrator issued the decision on the merits after a hearing on Durr's grievance. Broadly, the arbitrator's award found that the Chapter had provided evidence of race discrimination and that WSU had been "vindictive and petty" toward Durr, had given undue weight to anonymous student complaints, and had used the student complaints as a "pretext" to discipline Durr for "other, perhaps invidious, reasons." Specifically, the arbitrator concluded that: 1) WSU had shown "no just cause for discipline," such that the letter of reprimand should be rescinded and removed from Durr's personnel file; 2) WSU must compensate Durr for six hours of teaching for the summer 2020 term; 3) WSU must compensate Durr for her three-day unpaid suspension; and 4) the "current Provost or President" of WSU must "apologize in writing" to Durr for the University's having interfered with her leadership opportunities." The arbitrator found the anger management training to be "moot" since Durr had completed the requirement.

{¶ 15} In his decision, the arbitrator also noted that the "chain of custody" of the complaints had not been established (i.e., it was unclear at the arbitration hearing who

had retrieved the anonymous complaints from the online portal and how the complaints made their way to the decisionmakers), and he commented critically on the fact that WSU had not introduced the complaints about Durr through direct "witness testimony" but "through affidavits sworn by persons other than the authors of the complaints."

{¶ 16} On April 21, 2022, WSU filed a motion in the common pleas court to vacate the arbitrator's award, asserting that the arbitrator had "exceeded his powers" and "imperfectly executed them" under R.C. 2711.10.

{¶ 17} Regarding the jurisdictional issues, WSU argued that at no time after it issued a response to Durr's amended grievance did the Chapter, "within 30 days or otherwise," inform WSU that it elected arbitration. Rather, WSU Deputy General Counsel Michael Manzler received an email from FMCS with a panel of proposed arbitrators. WSU asserted that it had "consistently maintained" that the Chapter had failed "to follow the explicit CBA provisions for properly and timely taking a grievance to arbitration" and, as such, the grievance was "moot" and the arbitrator had no jurisdiction to address its merits.

{¶ 18} With respect to the merits of the arbitrator's decision, WSU asserted that the arbitrator had shown "a *willful blindness* to the substantial and severe allegations that formed the basis for WSU's subsequent personnel actions" and had insinuated that "these [student] complaints *did not exist,* or worse, were *fabricated* by the University" as a pretext for disciplining Durr on the basis of her race, notwithstanding that the parties had stipulated to an exhibit that contained the verbatim text of each of these complaints. WSU's objections included that the Chapter had sought discovery of the "original

complaints" against Durr -- to which it was not entitled under the CBA and which WSU had refused to provide -- because it did not want to "expose *students*, and potentially other *bargaining unit members* or staff, to the specter of retaliation – by someone who had already, by numerous accounts, threatened retaliation." WSU also described its use of the "EthicsPoint" website to allow anonymous reporting of concerns at the school. WSU asserted that Milligan had authenticated the printouts of the EthicsPoint complaints as true and accurate copies of WSU business records. Further, WSU argued that Durr admitted to threatening to withhold grades in the pre-disciplinary process. WSU asserted that, in finding that the Chapter was entitled to certain documents in discovery, the arbitrator had "cit[ed] a CBA section that had no relevance to arbitration proceedings (Section 16.8)" and improperly "read into the CBA a non-existent discovery framework."

{¶ 19} With respect to the FMLA issue, WSU asserted that Durr had engaged in policy violations during her FMLA absence by failing to record her use of accrued paid sick leave after the expiration of the 12 weeks of FMLA. WSU also asserted that Durr had requested FMLA leave for surgery, but despite never having the surgery, she submitted certification that she was cleared by her physicians to return to work on May 5, 2020. WSU argued that the disciplinary meeting on July 21, 2020, was arguably "*the* core element of the CBA's disciplinary process," but that the arbitrator said "virtually nothing about this meeting * * * [or] about Dr. Durr's uncontested admissions against interest at the meeting." WSU further asserted that Durr had admitted her failure to record her sick leave usage. WSU argued that the consequences imposed upon Durr were "specifically contemplated" by Article 14 of the CBA.

{¶ 20} WSU argued that although Durr's grievance alleged a violation of Article 3, the CBA's non-discrimination provisions, she had "identified no evidence indicating any particular discriminatory treatment, let alone any evidence of racial (or other unlawful) motivation for any such alleged differential treatment."

{¶ 21} WSU argued that the arbitrator had exceeded his authority by rewriting the parties' CBA to revive the Chapter's untimely grievance and to excuse the Chapter from satisfying an explicit contractual condition precedent to arbitration. According to WSU, the arbitrator "ignored express, mandatory deadlines and procedural steps in the parties' negotiated CBA language" related to arbitration. WSU further contended that the arbitrator exceeded his authority by fashioning ultra vires remedies, in that his directives to rescind Durr's letter of reprimand, to compensate her for six hours of teaching for the summer of 2020, and to issue a written apology to Durr were unlawful and exceeded the arbitrator's authority under the CBA. WSU argued that the arbitrator "had no authority under the CBA to decide whether WSU had discriminated against, harassed, or retaliated against Dr. Durr in violation of federal or state civil rights laws." According to WSU, the arbitrator "issued findings concerning WSU's alleged liability for *systemic race discrimination and unfair labor practices.* This is a textbook example of dispensing his own brand of industrial justice."

{¶ 22} The Chapter filed an application to confirm and enforce the arbitrator's award on May 4, 2022.

{¶ 23} In overruling WSU's motion to vacate the arbitration award, the trial court stated:

After review, the Court finds insufficient evidence to vacate the arbitrator's award in this case. It is clear there is a rational nexus between the applicable collective bargaining agreement and the arbitrator's award. Further, the award at issue flows rationally from the terms of the collective bargaining agreement and is not arbitrary, capricious, or unlawful. * * *

**{¶ 24}** WSU asserts one assignment of error on appeal:

THE TRIAL COURT ERRED WHEN IT DETERMINED THAT THE ARBITRATOR HAD NOT EXCEEDED HIS POWERS OR SO IMPERFECTLY EXECUTED THEM THAT A MUTUAL, FINAL, AND DEFINITE AWARD UPON THE SUBJECT MATTER WAS NOT MADE, IN ACCORDANCE WITH R.C. 2711.10(D).

**{¶ 25}** WSU's arguments on appeal are similar to those raised in the trial court. WSU asserts that the arbitrator exceeded his authority by rewriting the CBA to revive the Chapter's untimely grievance and to excuse the Chapter from satisfying an explicit contractual condition precedent to arbitration. WSU argues that the arbitrator exceeded his authority by imposing ultra vires remedies and making findings related to racial discrimination and labor practices. According to WSU, the arbitrator unlawfully ordered the purging of public records and ignored uncontroverted evidence in awarding summer compensation to Durr, and he imposed an extracontractual remedy that constituted compelled speech.

**{¶ 26}** "After an award in an arbitration proceeding is made, any party to the arbitration may file a motion in the court of common pleas for an order vacating, modifying,

or correcting the award as prescribed in sections 2711.10 and 2711.11 of the Revised Code." R.C. 2711.13. R.C. 2711.10 provides: "In any of the following cases, the court of common pleas shall make an order vacating the award upon the application of any party to the arbitration if: * * * (D) The arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." "R.C. 2711.10 is 'substantively equivalent' to 9 U.S.C. 10, a provision of the Federal Arbitration Act, and we have often used federal law in aid of our application of the Statute.' " *Portage Cty. Bd. of Dev. Disabilities v. Portage Cty. Educators' Assn. for Dev. Disabilities*, 153 Ohio St.3d 219, 2018-Ohio-1590, 103 N.E.3d 804, ¶ 20.

{¶ 27} When "reviewing a decision of a common pleas court confirming, modifying, vacating, or correcting an arbitration award, an appellate court should accept findings of fact that are not clearly erroneous but decide questions of law de novo." *Id.* at ¶ 26. "The question whether an arbitrator has exceeded his authority is a question of law that we review de novo." *Green v. Ameritech Corp.,* 200 F.3d 967, 974 (6th Cir. 2000).

{¶ 28} "An arbitrator is confined to interpreting the provisions of a CBA as written and [must] construe the terms used in the agreement according to their plain and ordinary meaning." *Internatl. Assn. of Firefighters, Local 67 v. Columbus,* 95 Ohio St.3d 101, 103, 766 N.E.2d 139 (2002), citing *Ohio Office of Collective Bargaining v. Ohio Civ. Serv. Emp. Assn., Local 11, AFSCME, AFL-CIO*, 59 Ohio St.3d 177, 180, 572 N.E.2d 71 (1991). The Ohio Supreme Court stated:

In *United Steelworkers of America v. Enterprise Wheel & Car Corp.*,

[363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)], the United States Supreme Court cautioned that " * * an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look * * * for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement.  When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award."  *Id.* at 597 * * *.  Thus, we will accord considerable latitude to an arbitrator, but we recognize his powers are not unlimited in the resolution of labor disputes.  "The arbitrator is confined to the interpretation and application of the collective bargaining agreement, and although he may construe ambiguous contract language, he is without authority to disregard or modify plain and unambiguous provisions."  *Detroit Coil Co. v. Internatl. Assn. of Machinists & Aerospace Workers, Lodge No. 82* (C.A.6, 1979), 594 F.2d 575, 579; * * *. Accordingly, it is our duty to determine whether the arbitrator's award was reached in a rational manner from the collective bargaining agreement. See *Detroit Coil, supra*; * * *.

*Ohio Office of Collective Bargaining at* 179-180.

{¶ 29} As noted by the Sixth Circuit:

An award fails to derive its essence from the agreement when: (1) it conflicts with express terms in the agreement; (2) it imposes additional

requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on "general considerations of fairness and equity" instead of the exact terms of the agreement.

*Dallas & Mavis Forwarding Co., Inc. v. General Drivers, Warehousemen & Helpers, Local Union No. 89*, 972 F.3d 129, 134 (6th Cir.1992).

**{¶ 30}** In this case, Article 14 of the CBA governed discipline.   It provided:

14.1   The University has and retains the right to apply discipline up to and including termination of a Bargaining Unit Faculty Member pursuant to Articles 14, T15, and N15.   The University subscribes to the principles of progressive discipline except when summary action is necessary and appropriate.   In determining whether or not to impose discipline and the severity of such discipline the University shall consider the severity of the Bargaining Unit Faculty Member's conduct and his or her disciplinary record, and the provisions of Article 5, "Academic Freedom and Professional Responsibilities."

* * *

14.2   The University will not impose discipline except for just cause.

14.3   When in the judgment of the President or a provost the presence of a Bargaining Unit Faculty Member on University premises presents a threat to the health or safety of any person in this University community or represents a threat of disruption of or interference with any normal and

lawful activities of the University, its staff or students, the President or a provost may suspend the Member pending the disposition of the disciplinary process provided for under Articles 14, T15, and N15. Such suspension shall be with pay * * *.

* * *

14.5.5 For serious or repeat offenses, discipline the University might impose includes but is not restricted to the following measures: required training (such as diversity or anger management); denial of summer teaching opportunities pursuant to Section 7.8.1; adjustments to the weights applied for annual evaluation pursuant to Section T11.2.6 or N11.2.6; paid suspension; unpaid suspension for three days pursuant to this Article 14, or longer unpaid suspension pursuant to Article T15 or N15 * * *; and termination pursuant to Article T15 of N15. * * *

{¶ 31} Article 16 of the CBA governed grievances and arbitration. Article 16 provided as follows:

16.1 The parties recognize and endorse the importance of establishing a prompt, fair and efficient mechanism for the orderly resolution of complaints and agree to make every effort to encourage the informal resolution of complaints before they become formal grievances. Any formal or informal resolution achieved must be consistent with the terms of this Agreement. The procedures set forth in this Article shall be the sole and exclusive method of disposing of grievances.

16.2.6   Unless extended by mutual consent, in writing, the time limit specified herein will be the maximum time allowed.   If the University fails to comply with the time limits to respond, the Grievant may advance the grievance to the next step by sending a letter of notification to the administrator at the next step.   Failure to advance the grievance shall render the grievance moot.

* * *

16.4   Grievance Step One: A Bargaining Unit Faculty Member(s) or the [Chapter] may file a grievance with the Associate Provost for Faculty and Staff Affairs not later than forty (40) days after the event giving rise to the grievance or no later than forty (40) days after the Grievant knew or reasonably should have known of the event giving rise to the grievance.

16.4.1   The Grievant shall state clearly on the grievance form in Appendix F the nature of the grievance, the contractual provision(s) allegedly violated, the name of the University administrator whose actions are being grieved (if known), the dates when the alleged act or omission giving rise to the grievance occurred, and the remedy sought.   The Grievant shall also sign the form and submit it to the Associate Provost with a copy to [the Chapter].

* * *

16.4.2   The University shall inform [the Chapter] of any grievance meeting and [the Chapter] has the right to be present at any grievance meeting. * * *

16.4.3   A Dean or provost shall hold a meeting with the Grievant and [the

Chapter's] representative (if the [Chapter] elects to be present) at a mutually agreeable time and location within ten (10) days after the grievance was filed and shall then respond in writing to the Grievant and the [Chapter] no later than fifteen (15) days after the completion of the grievance meeting(s). If the Grievant or the [Chapter] does not accept the Step One answer, either may, within fifteen (15) days, file a Step Two grievance with the Associate Provost.

* * *

16.5   Grievance Step Two:   Upon receiving a Step Two grievance, the Provost or Associate Provost[1] shall hold a meeting with the Grievant and the [Chapter's] representative * * * at a mutually agreeable time and location within ten (10) days after the Associate Provost has received the grievance. * * * The provost who holds the meeting shall respond in writing to the Grievant and the [Chapter] no later than fifteen (15) days after the completion of the grievance meeting(s).

16.6   Arbitration:   If the [Chapter] is not satisfied with the Step Two answer, it shall have the sole right to submit the grievance to arbitration by an external arbitrator, within thirty (30) days after receiving the Step Two answer. * * *

16.6.1 If the [Chapter] elects to pursue external arbitration, representatives of the [Chapter] and of the Provost shall meet within ten (10) days to select

---

[1] As noted above, the "University Response to Step Two Grievance" was issued by Doom, Associate Dean of the College of Engineering and Computer Science.

an arbitrator. In the event the parties are unable to agree upon an arbitrator, the parties shall ask either the American Arbitration Association (AAA) or the Federal Mediation and Conciliation Service (FMCS) to provide fifteen names. If the parties are unable to agree on which of the 15 nominees shall serve as an arbitrator, then the arbitrator will be chosen by alternately striking names.

* * *

16.9   No changes can be made to a grievance once it is filed under Section 16.4 except as follows: After completing Step Two and before submitting a grievance to arbitration, the Grievant may change or add to the specific provision(s) of the Agreement allegedly violated. In such cases, the amended grievance will be resubmitted to the Provost, who no later than ten (10) days after receiving the amended grievance form shall reconfirm his or her original Step Two written response, offer an amended written response, or call another Step Two meeting in accordance with Section 16.5.

(Footnote added.)

{¶ 32} Regarding the arbitrator's authority, the CBA provides as follows:

16.6.4 Remedies.   An external arbitrator hearing a grievance shall be bound by the following restrictions:

16.6.4.1   The arbitrator's decision shall be limited to only the question or questions submitted for decision;

16.6.4.2 The arbitrator shall not substitute a judgment for that of the University where the University's judgment and actions do not violate the written provisions of this Agreement;

16.6.4.3 The arbitrator shall have no authority to add to, subtract from, alter, change or modify any of the provisions of this Agreement;

16.6.4.4 The arbitrator shall not render any decision which would result in the violation of state or federal law; and

16.6.4.5 The arbitrator shall make no award that provides a Bargaining Unit Faculty Member compensation greater than would have resulted had there been no violation.

{¶ 33} We begin by addressing WSU's assertion that the arbitrator exceeded his authority by "adding to and subtracting from the express terms of the CBA" and thereby improperly exercising jurisdiction over Durr's grievance. Section 16.1 of the CBA provides that the "procedures set forth in this Article shall be the sole and exclusive method of disposing of grievances." As noted above, Section 16.6 grants to the Chapter the "sole right" to submit a grievance to arbitration, and Section 16.6.1 provides that if the Chapter does elect to pursue arbitration, "representatives of [the Chapter] and of the Provost *shall meet* within ten (10) days to select an arbitrator. In the event the parties are unable to agree upon an arbitrator, the parties shall ask either the [AAA] or the [FMCS] to provide 15 names." In our view, the mention of representatives of both parties and the plural usage of "parties" in Section 16.6 contemplates an initial collaborative effort to agree on an arbitrator. However, in its brief, the Chapter acknowledges that on February

4, 2021, it "submitted the grievance to arbitration" and "requested a panel of arbitrators" from FMCS without prior discussion of the matter with WSU; thereafter, WSU "received written notification of the submission to arbitration," after which the Chapter's attorney "followed up" with the University's attorney about selecting an arbitrator from the list provided by FMCS.

{¶ 34} WSU produced several emails relevant to how the university learned of the Chapter's request for arbitration. In a February 4, 2021 email from FMCS to Michael Manzler, Deputy General Counsel for WSU, FMCS provided the list of 15 arbitrators. Manzler's responsive email to FMCS stated: "Thank you for providing the attached panel. I am the University's legal representative. I was not copied on the panel request that was submitted to FMCS, however – would you please email me a copy of the form, letter, email, or whatever else you received requesting this panel?" FMCS responded to Manzler stating: "* * * there isn't paperwork to provide since the [Chapter] processed this online electronically."

{¶ 35} WSU's Step Two response to Durr's grievance was issued on December 8, 2020. Section 16.6 clearly and unambiguously provides that the Chapter "shall have the sole right to submit the grievance to arbitration * * * within thirty (30) days *after receiving the Step Two answer.*" (Emphasis added.) Although the Chapter asserts that the 30-day period began to run on January 11, 2021, when WSU responded to the "Amended Grievance" that Durr filed on December 18, 2020 pursuant to CBA Section 16.9, this interpretation is contrary to the plain language of Section 16.6 referring to the receipt of the Step Two answer.

**{¶ 36}** This conclusion is further supported by our determination that Durr's amended grievance did not comply with Section 16.9, which prohibited changes to a grievance form except that the grievant "may change or add to the specific provision(s) of the agreement allegedly violated."  In her amended grievance, Durr cited Article 3.2 and 3.3 as the sections of the CBA that she believed had been violated; these were the same sections she had cited in her Step One and Step Two grievances.  We agree with Interim Vice Provost Small's finding that Durr did not "change or add" any sections that she alleged had been violated; rather, Durr "added new arguments and/or repeated old ones allegedly supporting" her grievance.  Small properly concluded that the amended grievance was "not a proper use of Section 16.9."  The arbitrator acted unreasonably and exceeded his authority in interpreting WSU's rejection of the amended grievance and a "new Step Two answer" for purposes of calculating the time in which the Chapter had to request arbitration.

**{¶ 37}**  Section 1.7 of Article 1 of the CBA provides: "Time limits referred to in this Agreement as 'days' shall be defined as business days: Monday through Friday throughout the calendar year, excluding Saturdays and Sundays, formal holidays recognized by the University, and periods when the University is officially closed."  In correspondence discussing the timeliness of the request for arbitration with the arbitrator, Michael Manzler stated:

> * * * Carefully counting University business days only, per Section 1.7, i.e. excluding the holidays, winter break closure, and MLK day, means the 30th business day thereafter fell on January 29, 2021. (There were 11 business

days, from 12/09/2020 to 12/23/2020, inclusive, before the University's holiday/winter break started on 12/24/2020, and the University reopened on 1/04/2021, so 19 more business days takes us to (and including) Friday 1/29/21). * * *

{¶ 38} Pursuant to Section 16.2.6, "[u]nless extended by mutual consent, in writing, the time limit specified herein will be the maximum time allowed." Further, Section 16.6.4.3 states that the "arbitrator shall have no authority to add to, subtract from, alter, change or modify any of the provisions of this Agreement." Even assuming that Durr's grievance was properly submitted to arbitration on February 4, 2021, when she requested a panel of arbitrators from FMCS, it was undisputed that this was more than 30 business days after the Step Two answer. Based upon the foregoing, we conclude that the arbitrator exceeded the authority granted to him by the parties to the CBA in considering the time-barred grievance. In other words, pursuant to R.C. 2711.10(D), the arbitrator lacked jurisdiction to consider the merits of Durr's grievance, and the trial court erred in concluding that the arbitrator's award "flow[ed] rationally from the terms" of the CBA.

{¶ 39} Finally, even if we were to conclude that the arbitrator did have jurisdiction to consider Durr's grievance, the arbitrator acted beyond his authority and exceeded the restrictions in Section 16.6 of the CBA. In ordering the removal of the letter of reprimand/warning, ordering WSU to compensate Durr for summer teaching and the three-day unpaid suspension, and ordering it to provide a written apology, the arbitrator substituted his judgment for that of WSU where WSU's judgment and actions did not violate the written provisions of the CBA.

{¶ 40} Based upon the foregoing, the judgment of the trial court is reversed, and the arbitrator's award is vacated.

. . . . . . . . . . . . .

EPLEY, J. and LEWIS, J., concur.